**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| JOSEPH JOHNSON, | ) ) | |
| Plaintiff, | ) ) ) | |
| | ) | Civil Action No. 1:24-cv-3354-LKG |
| v. | ) ) | Dated: July 23, 2026 |
| WARDEN, OFFICER MIGUEL REYES, OFFICER HARRY CARR, and OFFICER BRANDON REED, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

USDC- GREENBELT
'26 JUL 23 PM4:36

## <u>MEMORANDUM OPINION</u>

Self-represented Plaintiff Joseph Johnson filed an Amended Complaint, at this Court's direction, alleging that his constitutional rights were violated at Western Correctional Institution ("WCI")when Defendants, Officers Miguel Reyes, Harry Carr, and Brandon Reed, pepper sprayed and assaulted him inside his cell. ECF No. 7. In response to the Amended Complaint, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment, which is ripe for this Court's review.[1] ECF No. 23.

Also pending are Johnson's Motion to Appoint Counsel (ECF No. 27) and Motion for Injunction (ECF No. 29). Johnson also supplemented his Amended Complaint. ECF No. 31. Defendants moved to strike the motion for preliminary injunction and the supplement. ECF Nos. 30 and 32. Upon review of the pleadings filed, this Court finds no need for a hearing. *See* D. Md. Local R. 105.6 (2025). For the reasons set forth below, Defendants' Motion to Dismiss or for Summary Judgment will be granted in part and denied in part and Johnson's Motion to Appoint Counsel will be granted; all remaining motions will be denied.

---

[1] On February 10, 2026, this Court issued an Order granting Defendants Motion for Leave to File a Physical Exhibit Under Seal (ECF No. 21) with the proviso that the digital recording that had been filed with the Court would be replaced within 10 days of the date of the Order. ECF No. 28. The Court notified Defendants that the exhibit filed contained no recording. *Id.* Defendants have not filed a corrected version of the recording and the time for doing so has long since passed. The Court will therefore not consider video footage.

I.    **Background**

A.    **Amended Complaint**

All events described by Johnson took place at WCI; when he filed his Amended Complaint, he had been transferred to Roxbury Correctional Institution ("RCI"). Johnson, who uses a wheelchair, alleges that on June 30, 2024, Officer Reyes pushed him in his wheelchair back to his cell after he was denied medical attention. ECF No. 7 at 4. He claims that once he was placed in the cell, the pain in his stomach he had sought medical attention for had reached a ten and he asked for a supervisor. *Id.* While he was sitting in a chair inside the cell, he states that Reyes called for the cell door to be opened. *Id.* Once the door was opened, Reyes called for Officers Reed and Carr to come to the cell to assault Johnson. *Id.* According to Johnson, Reed and Carr came into his cell and began kicking him in his ribs as Reyes held Johnson's arms over his head, while he was still handcuffed. *Id.* Johnson recalls screaming out that he was in pain and asking the officers what they were doing. He claims he was begging them to stop because his stomach hurt. Johnson also states that he told the officers he needed medical attention. *Id.* Reyes told Johnson it was too late and then told Carr to "spray him." *Id.* Johnson recalls closing his eyes in an attempt to keep the mace out. *Id.* He states that when he was sprayed with mace, Reyes continued to hold his hands and arms over his head, and that he remained handcuffed. *Id.*

Johnson recalls that, despite the use of the chemical agent, Defendants continued to beat him, hitting him in the ribs and stomach. ECF No. 7 at 5. Johnson states that he was maced a second time while Reyes held his face. *Id.* Johnson states that he attempted to fall to the ground in pain so he could protect himself, but instead he was picked up and slammed down into the cell. *Id.* He claims he was picked up a second time by his hair, and he was slammed into the doorway between the cell and the tier. *Id.* Johnson recalls being yanked off the floor while being yelled at and put into the wheelchair before he was pushed to the property room, put in "the cage," and left for approximately one-hour in "burning pain." *Id.* He adds that he believes these acts were committed to retaliate against him. *Id.*

Johnson seeks damages of one-billion dollars for cruel and unusual punishment, and violation of the Americans with Disabilities Act. ECF No. 7 at 5. In addition, he asks that all officers be "equally sanctioned or terminated," to be reassigned to a single cell, for the officers to be enjoined from further retaliation against him, and to be released from prison. *Id.* Johnson

also references the relief he sought in his ARP complaint but does not specify details of the complaint or the relief sought. *Id.*

**B.    Defendants' Response**

On June 30, 2024, Lt. Benjamin Wagner was assigned to investigate the incident involving Johnson. ECF No. 23-3 at 8. In his report, Wagner states that Johnson was assigned to administrative segregation and Officer Miguel Reyes was assigned to take Johnson to the medical room in Housing Unit ("HU") 4 to be evaluated by NP Burnice Mace for stomach pains. *Id.* Because Johnson uses a wheelchair, Reyes restrained Johnson's hands in front of him. *Id.*

According to Wagner's report, once Johnson was inside the medical room, he "became agitated and started yelling at NP Mace and refused his evaluation." *Id.* Johnson was then escorted back to his cell. *Id.* Once inside the cell, Johnson refused to permit the escorting officer, Officer Reyes, to remove his handcuffs by coming to the pass-through. *Id.* Reyes radioed for assistance; Officers Harry Carr and Brandon Reed responded. *Id.* Reyes called for the cell door to be opened. *Id.* Reyes claims his plan was to remove Johnson from the cell and place him in the HU #4 strip cage for a "cool down period" so that the "Officer in Charge" could speak with Johnson. *Id.* Once Reyes was inside the cell, Johnson stood up from the plastic chair he was seated in and grabbed Reyes by the front of his shirt. *Id.* Reed immediately deployed pepper spray and gave loud verbal commands for Johnson to cease his assault on Reyes. *Id.* A brief struggle ensued, and Johnson was taken to the floor inside the cell. *Id.* Reyes and Reed dragged Johnson from the cell and put him in a wheelchair located outside of the cell. *Id.*

Carr escorted Johnson to the HU #4 medical room where he was evaluated by RN Flanagan. *Id.* The June 30, 2024, report from Flanagan describes Johnson as "calm and cooperative." ECF No. 23-9 at 6. The evaluation took place after Johnson was pepper sprayed. *Id.* The medical records provided do not include a record of the appointment with NP Mace.

After Johnson was assessed by the nurse, Officer Ronald Conner escorted him to C-wing where he received a decontamination shower. ECF No. 23-3 at 8. Photographs were taken by Officer Joshua Henry of Johnson and each of the officers involved. *Id., see also* 25-29. Johnson was placed on Staff Alert status in Administrative Segregation pending adjustment. *Id.* at 8.

Wagner concluded that all "staff acted appropriately and within the scope of their authority as described in the Use of Force Manual." *Id.* at 9.

Johnson was charged with violating Rules 100 (disruptive act), 101 (assault on staff), 312 (interference of duties), 316 (disobey an order), and 410 (failure to obey specifically cited facility rule), in a Notice of Inmate Rule Violation issued June 30, 2024. ECF No. 23-3 at 20-21. He pleaded guilty to Rules 316 and 410 on July 19, 2024, in exchange for 15 days of segregation, 0 days loss of good conduct credit, and having the other more serious rule violations dropped. *Id.* at 32 -44.

An Internal Investigation Division ("IID") IID investigation was opened due to the assault on Officer Miguel Reyes. ECF No. 23-5 at 4. Reyes, however, did not want to press charges. *Id.* at 5. The investigating officer closed the investigation on or about August 21, 2024, after confirming that Reyes did not want to press charges and noted that the "administrative charge for assault on staff was dismissed." *Id.* at 5.

The June 30, 2024, record of Johnson's examination by Nurse Flanagan describes him as calm and cooperative, complaining of abdominal pain for which he had seen a provider three days prior. ECF No. 23-9 at 6. At the time she saw Johnson he was confined to the strip cage after being sprayed with pepper spray. *Id.* Flanagan was instructed by a provider to give Johnson a dose of Pepto Bismol with a plan for him to be reevaluated by a provider. *Id.* at 5.

On July 1, 2024, Johnson was seen by RN Kimberly K. Sanderlin for ongoing abdominal pain that had not improved with Pepto bismuth and it was noted that he had "labs drawn on 6/27/24." ECF No. 23-9 at 3-4. She wrote that his lungs were clear, his abdomen was soft with bowel sounds in all four quadrants, and that he had a normal bowel movement. *Id.* at 3. A plan was made for him to follow up with a provider and he was sent back to his cell in stable condition. *Id.*

On July 27, 2024, filed an Administrative Remedy Procedure complaint ("ARP") stating that Reyes, Carr, and Reed committed assault and battery against him on June 30, 2024. ECF No. 23-6 at 8-9 (ARP-RCI-0939-24). He claimed he was dealing with bad stomach pain and that he was denied medical care by Nurse Bernice. *Id.* at 8. He described how he doubled over in pain when he got to his cell because he had a sudden sharp pain in his stomach and theorized that perhaps he was not moving fast enough for Officer Reyes. *Id.* at 8-9. He stated that Reyes ordered Carr and Reed to punch him in the stomach and ribs and later ordered them to pepper spray him. *Id.* at 9. He goes on to point out that multiple policies were violated and asks for an investigation into those violations as well as damages, and a return of his property. *Id.* at 9. On

July 31, 2024, this ARP was procedurally dismissed pending resubmission because it contained "multiple unrelated issues." *Id*. at 8.  Johnson was instructed to resubmit his ARP by August 15, 2024, and to address one issue or "a reasonable number of closely related issues." *Id*.

On September 15, 2024, Johnson appealed his ARP to the Commissioner.  ECF No. 23-7 at 2-3.  On January 7, 2025, this appeal was dismissed as accepted in error because there was a pending IID investigation.  *Id*. at 1.

Johnson filed a grievance regarding the dismissal of his ARP with the Inmate Grievance Office ("IGO") on November 19, 2024.  ECF No. 23-8 at 4.  In a letter dated January 17, 2025, Sandra Holmes, Administrative Officer III of the IGO, sent a letter to Johnson advising that the IGO would defer consideration of his grievance because the allegations were "presently under investigation by the Internal Investigative Division." *Id*.

On April 17, 2025, Ms. Holmes sent a letter to Johnson on behalf of the IGO stating that a preliminary review of his grievance had been conducted and the grievance was being dismissed.  ECF No. 23-8 at 1-2.  The rationale for the dismissal was as follows:

> I have considered the issues you raised and decided that you have failed to state a claim upon which administrative relief can and should be granted, your allegations do not meet the requirements of Section 10-207 (c) of the Correctional Services and is dismissed.  I note that you were charged and found guilty of violating inmate rules 316 (disobey an order) and 410 (demonstrate; disrespect; insolence; or use of vulgar language after the institution submitted a signed Inmate Waiver of Appearance with a Plea Agreement form indicating that you was [sic] voluntarily waiving your right to appear before the hearing officer on July 19, 2024, and declining to pursue violations of inmate rules 100 (engage in a disruptive act), 101 (commit assault or battery on staff), and 312 (interfere with or resist a search of a person, item, area, or location; cause the early return of a community detail due to a violation of the rules; or Commit any inmate rule violation outside of the confinement of a secure facility). His decision also noted that you also indicated that you wished to accept the plea agreement offered by the Institution. He accepted the agreement negotiated between you and the Institution and imposed the sanctions. COMAR 12.07.01.07(B)(4) provides that a grievance "shall be dismissed on preliminary review as wholly lacking in merit if ... [t]he grievant has failed to exhaust remedies available under the ... disciplinary proceeding in a timely manner, and has not shown good cause for the failure to do so." I note that COMAR 12.03.01.20 provides that a plea of guilty constitutes a waiver of hearing rights and an admission that you committed the inmate rule violation(s). I conclude, therefore, that by pleading guilty to violating the above indicated inmate rules, you waived your right to a hearing and failed to exhaust remedies available under the disciplinary process.

Since you pled guilty to violating Inmate Rules 316 and 410, the issue of who assaulted whom was properly at issue in the disciplinary hearing, and should not be countenance in this separate, distinct and collateral proceeding. I also note that you failed to file an appeal to the warden. Since the exhaustion requirement has not been waived for good cause shown, COMAR 12.07.01.06(B)(4) requires that this grievance be dismissed as wholly lacking in merit.

*Id*. at 1-2.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

In reviewing the complaint in light of a Motion to Dismiss pursuant to Fed. R. Civ. Proc. 12(b)(6) the court accepts all well-pleaded allegations of the complaint as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff. *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005) (citing *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)); *Ibarra v. United States,* 120 F.3d 472, 473 (4th Cir. 1997).

A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The complaint, however, does not need "detailed factual allegations" to survive a motion to dismiss. *Id*. at 555. Instead, "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 563. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting *Twombly*, 550 U.S. at 570).[2] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has

---

[2] Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." *Migdal v. Rowe Price-Fleming Int'l Inc.*, 248 F.3d 321, 325-26 (4th Cir. 2001); *see also Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 513 (2002) (stating that a complaint need only satisfy the "simplified pleading standard" of Rule 8(a)).

alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

### B.  Summary Judgment

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion.  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004).  The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witnesses' credibility."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249. Moreover, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45.  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Nevertheless, to defeat summary judgment, conflicting evidence, if any, must give rise to a *genuine* dispute of material fact.  *See Anderson*, 477 U.S. at 247-48.  If "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute of material

fact precludes summary judgment. *Id*. at 248; *see Libertarian Party of Va. V. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Id*. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id*.

Because Johnson is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That notwithstanding, the court must also abide the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### III.   ANALYSIS

Defendants assert[3] that they are entitled to judgment in their favor because Johnson has not stated a viable ADA claim; did not exhaust administrative remedies as required by the PLRA; has failed to include facts or allegations that implicate Warden Weber's personal participation; has failed to state a claim of retaliation; and any Eighth Amendment claims are unsupported by the facts. ECF No. 23.

Johnson has filed supplemental pleadings consisting of additional ARP complaints that concern his claims that the "medical department" is posing a continued threat to his health and safety by failing to deliver his medication and a hernia belt, which were found meritorious. ECF No. 29-1. Other matters raised in these ARPs concern allegations that he was assaulted by other inmates and officers failed to protect him from the violence committed against him, which occurred on December 12, 2025. *Id*. at 12 and 22.

He explains in another supplemental pleading that during the June 30, 2024 incident, the Defendants came into his cell to beat him because he was dealing with a lot of pain from two

---

[3] In addition to the listed claims, Defendants claim they are entitled to Eleventh Amendment immunity on any official capacity claims that may be implied by the content of Johnson's amended complaint. Under the Eleventh Amendment to the United States Constitution, a state, its agencies and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471-72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Defendants are immune from suit for actions taken in their official capacity and, to the extent such claims are raised, they are dismissed.

hernias that required medical attention he was not being provided. ECF No. 31 at 1. The officers did not believe he was in pain, but on April 8, 2026, he had required surgery to repair the hernias, one in his stomach and the other in his groin,. *Id.* To the extent both supplements are relevant to the claims raised in the amended complaint, the substance of the supplements will be considered as opposition to the Motion for Summary Judgment.    Defendants' Motions to Strike will be denied. ECF Nos. 30 and 32. Each of the parties' claims are addressed below.

A.      **ADA Claim**

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), and "to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." *Id.* § 12101(b)(2). Title II of the ADA, which is at issue here, prohibits public entities, including "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government," *id.* § 12131(1), from discriminating "by reason of" disability against a "qualified individual with a disability." *Id.* § 12132.[4]

For purposes of Title II, a "qualified individual with a disability" is defined as an individual with a disability "who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). State prisoners, such as plaintiffs, may qualify as "qualified individual[s] with . . . disabilit[ies]," *id.*, so as to come within the protection of Title II of the ADA. In *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998), a unanimous Supreme Court held that "the plain text of Title II of the ADA unambiguously extends to state prison inmates." Although the Fourth Circuit "has not squarely addressed the issue," several circuits "have determined that § 12132's words 'or be subjected to discrimination by that entity' are meant to be a 'catch-all phrase that prohibits all discrimination by a public entity, regardless of the context'"—in other words, that Title II of the ADA applies to "anything a public entity does." *Seremeth v. Bd. of Cty.*

---

[4]      Title I of the ADA prohibits discrimination against individuals with disabilities in employment. *See id.* § 12111 *et seq.* Title III applies to public accommodations. *See id.* § 12181 *et seq.*

*Comm'rs of Frederick*, 673 F.3d 333, 338 (4th Cir. 2012) (citing cases) (citations omitted); *see also Paulone v. Frederick*, 787 F. Supp. 2d 360, 380-81 (D. Md. 2011) (collecting authority).

While it is true that Johnson, as a person who uses a wheelchair, fits the definition of an individual with a disability, something much more is needed than a conclusory statement that the ADA was violated to state a claim. Here, Johnson has failed to include factual allegations that show that these Defendants discriminated against him based on his disability. This claim must be dismissed.

**B.    Exhaustion of Administrative Remedies**

Defendants raise the affirmative defense that Johnson has failed to exhaust administrative remedies as required by the Prisoner Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e (a), which provides that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008); *see Langford v. Couch*, 50 F.Supp. 2d 544, 548 (E.D. Va. 1999) ("[T]he . . . PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).'" *Woodford* 548 U.S. at 93 (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (emphasis in original). But the court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *see Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

In Maryland prisons, the Administrative Remedy Procedure is the administrative process that must be exhausted. Md. Code Regs. § 12.02.28.02(B)(1), (D) (2018). First, a prisoner must file an ARP with the warden within 30 days of the incident at issue. Md. Code Regs. § 12.02.28.05(D)(1) (requiring filing with the "managing official"); Md. Code Regs. § 12.02.28.02(B)(14) (defining "managing official" as "the warden or other individual

10

responsible for management of the correctional facility"); Md. Code Regs. § 12.02.28.09(B) (setting the 30-day deadline). Second, if the ARP is denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the Commissioner of Correction within 30 days. Md. Code Regs. § 12.02.28.14(B)(5). If the appeal is denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). *See* Md. Code. Ann., Corr. Servs. §§ 10-206, 10-210; Md. Code Regs. § 12.07.01.05(B). Inmates may seek judicial review of the IGO's final determinations in a Maryland Circuit Court. *See* Md. Code Ann., Corr. Servs. § 10-210(a).

An inmate need only exhaust "available" remedies. 42 U.S.C. § 1997e(a). In *Ross v. Blake*, 578 U.S. 632 (2016), the Supreme Court rejected a "freewheeling approach to exhaustion as inconsistent with the PLRA." *Id*. at 635. In particular, it rejected a "special circumstances" exception to the exhaustion requirement. *Id*. But, it reiterated that "[a] prisoner need not exhaust remedies if they are not 'available.'" *Id*. at 636. "[A]n administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette,* 517 F.3d at 725, *see also Younger v. Crowder*, 79 F.4th 373, 380 (4th Cir. 2023) (plaintiff did not fail to exhaust administrative remedies where none were available to him due to ongoing IID investigation).

The Supreme Court stated in *Ross* that an administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" 578 U.S. at 642 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). Thus, an inmate must complete the prison's internal appeals process, if possible, before bringing suit. *See Chase v. Peay*, 286 F. Supp. 2d 523, 529-30 (D. Md. 2003). As a prisoner, plaintiff is subject to the strict requirements of the exhaustion provisions. *See Porter v. Nussle*, 534 U.S. 516, 528 (2002) (no distinction is made with respect to exhaustion requirement between suits alleging unconstitutional conditions and suits alleging unconstitutional conduct). Exhaustion is also required even though the relief sought is not attainable through resort to the administrative remedy procedure. *See Booth*, 532 U.S. at 741.

The *Ross* Court outlined three circumstances when an administrative remedy is unavailable and an inmate's duty to exhaust available remedies "does not come into play." 578 U.S. at 643. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or

11

consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 643-44. The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 644.

Defendants acknowledge that *Younger* is the applicable law in this case as Johnson's ARPs were dismissed because there was a pending IID investigation. ECF No. 23-1 at 19-20. They nevertheless argue that because Johnson elevated his ARP complaint to the IGO when he "could have abandoned his pursuit of administrative remedies without pursuing intermediate and final administrative appeals" he failed to exhaust by filing his complaint before the IGO dismissed his grievance on the merits. *Id.* at 20. They assert that Johnson should have waited to again be refused any meaningful review before filing his complaint based on precedent holding that exhaustion is required even where the relief sought is not offered through the administrative procedure. *Id.* (citing *Booth v. Churner*, 532 U.S. at 740-41 (2001). This argument elevates form over substance.

The plain fact of the matter is that Johnson's ARP was dismissed due to a pending IID investigation. This case not only falls within the facts outlined in *Younger*, but is also a case where the administrative procedure amounts to a simple dead end as explained in *Ross*. Accordingly, the merits of Johnson's claims will be reached herein.

## C.    Personal Participation

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To state a claim for supervisory liability under § 1983 based on a subordinate's conduct, the plaintiff must allege that (1) the supervisor had actual or constructive knowledge that

subordinate's conduct "posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff" (2) the supervisor responded in a manner that was so inadequate that it showed "deliberate indifference to or tacit authorization" of the subordinate's conduct; and (3) there was "an affirmative causal link between the supervisor's inaction" and the plaintiff's constitutional injury. *Timpson by & through Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994)).

Here, Johnson's claim against the Warden is based on nothing more than the Warden's position as a supervisor. There are no specific allegations against him in the body of the amended complaint and no facts implicating him in any wrongdoing. The claim against him must be dismissed.

**D.      Retaliation**

A retaliation claim is analyzed under the First Amendment right to petition for redress of grievances. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228–29 (2001). "[A] prison inmate retains those First Amendment rights that are not inconsistent with the status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S. Carolina Dep't of Corrections*, 855 F.3d 533, 545 (4th Cir. 2017).

Johnson's retaliation claim does not specify what Officers Reyes, Carr, and Reed were retaliating against him for; rather, he simply states they were retaliating against him. In his later

opposition he alleges that the officers beat him because they did not believe that he needed medical care for his hernias which were causing him pain. ECF No. 31 at 1. In Reyes' report he states that Johnson was brought back to his cell after he refused to cooperate with a medical appointment he had with Nurse Mace. ECF No. 25-3 at 4. Johnson's assertion that any of the actions taken in connection with his initial removal from the medical room was retaliatory is unsupported by the facts. Further, there is nothing on this record that suggests that these defendants were motivated by some kind of a score they had to settle with Johnson. Defendants are entitled to summary judgment on this claim.

## E.    Excessive Force

Whether force used by prison officials was excessive is determined by inquiring if "force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U. S. 1, 6-7 (1992). This Court must look at the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley v. Albers*, 475 U.S. 312, 321 (1986).

"An inmate's claim of excessive force involves both an objective and a subjective component." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). The objective component asks whether the force applied was sufficiently serious to establish a cause of action. "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019), *see e.g. Escobar-Salmeron v. Moyer*, 150 F.4th 360, 373–74 (4th Cir. 2025) (finding bruised head, bleeding ear, and shoulder and back pain as meeting objective component of more than de minimis). The absence of significant injury alone is not dispositive of a claim of excessive force. *Wilkins v. Gaddy*, 559 U.S. 34 (2010). The extent of injury incurred is one factor indicative of whether the force used was necessary in a particular situation, but if force is applied maliciously and sadistically liability is not avoided simply because the prisoner had the good fortune to escape serious harm. *Id*. at 38.

"The more demanding part of the test … is the subjective component which asks a single question: whether the officers acted with a 'sufficiently culpable state of mind.'" *Dean*, 984 F.3d at 302 (quoting *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "[T]he state of mind required here is wanton infliction of pain." *Id*. (internal quotation marks omitted). Establishing

impermissible motive turns on whether "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986). "The question is not whether a reasonable officer could have used force to maintain discipline, but whether these particular officers did use force for that reason." *Brooks*, 924 F.3d at 113. The factors this Court must consider are the need for application of force; the relationship between that need and the amount of force applied; the extent of the injury inflicted; the extent of the threat to the safety of staff and inmates as reasonably perceived by prison officials; and any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321. "Corrections officers act in a 'good faith effort to maintain or restore discipline' — that is, with a permissible motive — not only when they confront immediate risks to physical safety, but also when they attempt to 'preserve internal order' by compelling compliance with prison rules and procedures." *Brooks*, 924 F.3d at 113 (quoting *Hudson*, 503 U.S. at 6).

Impermissible motive for the use of force by correctional officers, that is when it has been used maliciously and for the "very purpose of causing harm" *Whitley*, 475 U.S. at 320-21, occurs when pain is inflicted "to punish an inmate for intransigence or to retaliate for insubordination." *Brooks*, 924 F.3d at 113, *see also Boone v. Stallings*, 583 F. App'x 174, 177 (4th Cir. 2014) ("[T]he Eighth Amendment does not permit a correctional officer to respond to a misbehaving inmate in kind."). The use of force on an inmate who is "restrained and compliant and posing no physical threat" raises the specter of an impermissible motive. *Thompson v. Virginia*, 878 F.3d 89, 102 (4th Cir. 2017). "Malice analysis interrogates the need for and proportionality of force, which cannot be measured by observing physical injuries alone." *Escobar-Salmeron*, 150 F.4th at 374, (citing *Dean*, 984 F.3d at 304–06 (evaluating proportionality of pepper spray usage based on circumstances of its use)).

Defendants rely on the Fourth Circuit's holding in *Moskos v. Hardee*, 24 F.4th 289, 295-96 (4th Cir. 2022) proscribing damage claims in a 1983 suit when the claim would imply the invalidity of a prison disciplinary proceeding that has not been overturned, as the basis for their claim that Johnson's excessive force claim is procedurally barred. ECF No. 23-1 at 24. They reason that because he pleaded guilty to "disobeying orders and a related infraction for the events at his cell on June 30, 2024," and his disciplinary conviction has not been invalidated but "in fact served as a basis for the IGO's dismissal of [Johnson's ARP] appeal" he may not now claim that

15

the use of force was used for anything other than to maintain or restore order and discipline in the prison. *Id.*

Johnson made a plea agreement with prison officials to plead guilty to violating Rule 316, disobeying an order, and Rule 410 demonstrate disrespect, insolence, or use of vulgar language, in exchange for dismissal of remaining charges . ECF No. 23-3 at 33, 38. The charges not pursued were violation of Rule 100, engage in a disruptive act; Rule 101, commit assault or battery on staff; and Rule 312, interfere with or resist a search. *Id.* at 33. The narrative provided in the serious incident report justifying the use of force against Johnson described Johnson grabbing Reyes by the shirt, requiring Reed to spray Johnson with pepper spray while giving loud verbal commands for Johnson to stop assaulting Reyes. *Id.* The assault charges against Johnson were not pursued. Further, Johnson alleges that Defendants went beyond merely pepper spraying him to gain his compliance; that allegation is not refuted by his guilty plea to disobeying an order as it does not foreclose the possibility that Defendants used force beyond what was required to restore discipline and order to the prison. Moreover, his 1983 claim does not impugn his disciplinary conviction which did not result in the result in the loss of good conduct credit. Johnson is not attempting to "avoid the requirements of habeas relief 'by the simple expedient of putting a different label on [his] pleadings'" by seeking damages for an excessive force claim. *Moskos,* 24 F.4th at 295 (quoting *Preiser v. Rodriquez*, 411 U.S. 489-90 (1973)).

Johnson's description of the use of force that occurred inside his cell, outside the view of any surveillance cameras, depicts a malicious attack that went beyond that which was required to restore order and discipline to the prison, or in this case, to retrieve a pair of handcuffs. The two versions of events represent a genuine dispute of material fact that require credibility determinations not appropriate on summary judgment review. *See Anderson*, 477 U.S. at 255. The motion for summary judgment is therefore denied on the Eighth Amendment excessive force claim.

**F.    Medical Claim**

Defendants address Johnson's amended complaint as raising an Eighth Amendment medical claim. ECF No. 23-1 at 27-28. They assert that the undisputed facts show that Johnson refused medical attention from Nurse Practitioner Mace when he began yelling at her, but later he was taken to see a different nurse for the same complaint of abdominal pain. *Id.* at 28.

Johnson raises numerous seemingly unrelated claims regarding the quality of medical care he has received but does not focus those claims on the June 30, 2024 incident when he was escorted away from his evaluation with Mace. *See e.g.* ECF No. 31.

To state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 210 (4th Cir. 2017) (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. (2008)); *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

Assuming Johnson's medical need was serious, there is no evidence that these Defendants knew of a risk of harm to Johnson if he was not permitted to carry on with his evaluation by Mace despite his behavior but disregarded that risk. To establish the subjective component for this claim there must be some indication that the officers had actual knowledge of the risk of harm to the inmate. *Young v. Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001); *see also Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) ("It is not enough that the officer [ ] should have recognized it."). Beyond such knowledge, however, the officer must also have "recognized that his actions were insufficient" to mitigate the risk of harm to the inmate arising from his medical needs. *Parrish*, 372 F.3d at 303; *Iko*, 535 F.3d at 241. The reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001). Here, Reyes witnessed Johnson yelling at Mace, an allegation that Johnson does not deny. It is not unreasonable for Reyes to assume that ending the appointment posed little to no risk to Johnson. Defendants are granted summary judgment on this claim.

**G.    Qualified Immunity**

Defendants assert they are entitled to qualified immunity. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when

17

they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In particular, . . . qualified immunity protects law officers from 'bad guesses in gray areas' and it ensures that they may be held personally liable only 'for transgressing bright lines.'" *Gomez v. Atkins*, 296 F.3d 253, 261 (4th Cir. 2002) (quoting *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). The defense provides protection for public officials for mistakes of law, mistakes of fact, or a combination of the two. *See Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting). Qualified immunity is a defense from suit, not simply liability, which is lost if a matter is improperly permitted to go to trial. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Resolution of whether an official is entitled to qualified immunity must be determined "at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

In order to determine if a public official is entitled to the protections afforded by qualified immunity, two inquiries must be addressed by this Court. The first prong is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show [that] the officer's conduct violated a constitutional right[.]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the evidence establishes a violation of a constitutional right, the second prong is to assess whether the right was "clearly established" at the time of the events at issue. *Id.* If the right was not clearly established, the qualified immunity doctrine shields a defendant officer from liability. The "answer to both *Saucier* questions must be in the affirmative in order for a plaintiff to defeat a . . . motion for summary judgment on qualified immunity grounds." *Henry v. Purnell*, 501 F.3d 374, 377-78 (4th Cir. 2007) (citing *Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003)). "'Clearly established' means that, at the time of the officer's conduct, the law was 'sufficiently clear' that every 'reasonable official would understand that what he is doing' is unlawful. *Dist. of Columbia v. Wesby*, 583 U.S. 48, 61 (2018) citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The qualified immunity defense is unavailing in this both because the constitutional right was well-established at the time of the incidents at issue and because there exists a material dispute of fact regarding whether the conduct allegedly violative of plaintiff's constitutional right actually occurred. *See Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005). While it is true that qualified immunity is ordinarily determined at the summary judgment stage of litigation, *see Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003), the defense of "[q]ualified immunity does not, however, override the ordinary rules applicable to summary judgment proceedings."

18

*Willingham*, 412 F.3d at 559, citing *Pritchett v. Alford*, 973 F.2d 307, 313 (4th Cir. 1992).  As noted, there are material facts in dispute concerning whether Defendants' use of force violated Johnson's constitutional rights.  Such factual disputes preclude the application of qualified immunity at this time.  *Anderson*, 477 U.S. at 252.

## IV.     CONCLUSION

By separate Order which follows, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, is granted in part and denied in part; and their Motions to Strike are denied; Johnson's Motion to Appoint Pro Bono Counsel is granted; and his Motion for Injunction is denied without prejudice subject to refiling by pro bono counsel as appropriate.

**IT IS SO ORDERED**.

July 23, 2026
Date

LYDIA KAY GRIGGSBY
United States District Judge

19